AB:ADR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        - against -

NAIQING LIN,
     also known as "Nai Qing Lin,"

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**REMOVAL TO THE WESTERN DISTRICT OF OKLAHOMA**

(Fed. R. Crim. P. 5)

Case No. 23-MJ-446

EASTERN DISTRICT OF NEW YORK, SS:

        ANTHONY JIMENEZ, being duly sworn, deposes and states that he is a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), duly appointed according to law and acting as such.

        On or about May 2, 2023, the United States District Court for the Western District of Oklahoma issued a warrant for the arrest of the defendant NAIQING LIN, also known as "Nai Qing Lin," for violations of Title 18, United States Code, Section 1956(h).

        The source of your deponent's information and the grounds for his belief are as follows:[1]

        1.     On or about May 2, 2023, the United States District Court for the Western District of Oklahoma issued an arrest warrant (the "Arrest Warrant") for the arrest of defendant NAIQING LIN for violations of Title 18, United States Code, Section 1956(h).   A true and

---

[1]     Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

correct copy of the Arrest Warrant is attached hereto as Exhibit A, and a true and correct copy of the criminal complaint charging LIN with violations of 18 U.S.C. § 1956(h) is attached hereto as Exhibit B.

2.    On or about May 10, 2023, NAIQING LIN was arrested by HSI agents at his residence at 571 74th Street, Floor 2, in Brooklyn, New York.

3.    HSI arresting agents recognized NAIQING LIN from previous surveillance they had conducted and from a photograph that had been provided to them by agents in the Western District of Oklahoma.   HSI agents also verified LIN's identity on a New York State driver's license provided by him upon his arrest.   The photograph on the license was consistent with LIN's appearance and with the photograph from the Western District of Oklahoma that agents had previously reviewed, and the name and date of birth listed on the license was consistent with that of the NAIQING LIN wanted in the Western District of Oklahoma.

4.    Finally, HSI agents asked NAIQING LIN his name and date of birth, and his responses matched the name and date of birth of the NAIQING LIN wanted in the Western District of Oklahoma.

5.    Based on the foregoing, I submit that there is probable cause to believe that the defendant is the NAIQING LIN wanted in the Western District of Oklahoma.

WHEREFORE, your deponent respectfully requests that the defendant NAIQING

LIN be removed to the Western District of Oklahoma so that he may be dealt with according to

law.

_S/ Anthony Jimenez_
ANTHONY JIMENEZ
Special Agent
United States Department of Homeland Security,
Homeland Security Investigations

Sworn to before me this
__10__ day of May, 2023

_S/ Lois Bloom_
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# EXHIBIT A

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
### for the
Western District of Oklahoma

| | | | |
|---|---|---|---|
| United States of America | ) | | |
| v. | ) | Case No. M-23-276 | STE |
| Naiqing Lin, | ) | | |
| a/k/a Nai Qing Lin, | ) | | |
| | ) | | |
| | ) | | |
| | ) | | |
| _Defendant_ | | | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
_(name of person to be arrested)_     Naiqing Lin                                                                            ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☑ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

18 U.S.C. § 1956(h), Money Laundering Conspiracy

Date:     05/02/2023

_Shon T. Erwin_
_Issuing officer's signature_

City and state:     Oklahoma City, Oklahoma

Shon T. Erwin, U.S. Magistrate Judge
_Printed name and title_

| Return |
|---|
| This warrant was received on _(date)_ _____ , and the person was arrested on _(date)_ _____ at _(city and state)_ _____ . |
| Date: _____                               _____<br>_Arresting officer's signature_ |
| _____<br>_Printed name and title_ |

AO 442 (Rev. 11/11) Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

_____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____  Weight: _____

Sex: _____  Race: _____

Hair: _____  Eyes: _____

Scars, tattoos, other distinguishing marks: _____

_____

History of violence, weapons, drug use: _____

_____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

_____

FBI number: _____

Complete description of auto: _____

_____

Investigative agency and address: _____

_____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

_____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

_____

_____

# EXHIBIT B

AO 91 (rev.11/11) Criminal Complaint

AUTHORIZED AND APPROVED DATE: s/Nick Coffey 5/1/2023

# United States District Court
### for the

_____WESTERN_____ DISTRICT OF _____OKLAHOMA_____

United States of America )
)
v. )
)  Case No: M-23-276    -STE
Naigang Lin, )
  a/k/a Nai Lin, )
Brandon Lin, )
Naiqing Lin, )
  a/k/a Nai Qing Lin, )
Juan Lyu, and )
David Arman Smith, )

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 1, 2019, through on or about May 1, 2023, in the county of Oklahoma, in the Western District

of Oklahoma, and elsewhere, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy |

This criminal complaint is based on these facts:

See attached Affidavit of Special Agent, Josh Reinsch, HSI which is incorporated and made a part hereof by reference.

☒ Continued on the attached sheet.

_____
Josh Reinsch
Special Agent
HSI

Sworn to before me and signed in my presence.

Date: **May 2, 2023**

_____
Judge's signature

City and State: Oklahoma City, Oklahoma

Shon T. Erwin, U.S. Magistrate Judge
_Printed name and title_

**WESTERN DISTRICT OF OKLAHOMA**

**OKLAHOMA CITY, OKLAHOMA**

STATE OF OKLAHOMA    )
                            )
COUNTY OF OKLAHOMA  )

## <u>AFFIDAVIT</u>

I, Joshua Reinsch, being first duly sworn, hereby depose and state as follows:

1.    I am a special agent ("SA") of the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and as such am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.    I have been employed as a special agent with DHS/ICE/HSI since January 2010. I am currently assigned to the HSI Office of Grand Rapids, Michigan.

3.    During the course of my employment, I have participated in numerous drug investigations involving marijuana, cocaine, heroin, fentanyl, and methamphetamine, which have resulted in the arrests of targets, the seizure of illicit drugs and drug-related evidence, and the forfeiture of drug-

related assets. I have conducted and supervised complex financial investigations involving the trafficking of drugs and other contraband, and money laundering including the structuring, placement, and layering of large amounts of U.S. Currency. I have participated in and/or executed search and seizure warrants authorizing the search of locations used by drug traffickers and their co-conspirators, as well as vehicles used to transport controlled substances. Materials searched for and recovered in these locations have included controlled substances, packaging materials, scales, cutting agents, weapons, documents and papers reflecting the identities of co-conspirators and receipts for concealed investments, and proceeds from the distribution of controlled substances. I have personally participated in interviews of witnesses and cooperating sources regarding illegal trafficking in drugs and have read official reports of similar interviews by other officers. I have also participated in surveillance operations, observing and recording movements of persons trafficking drugs and those suspected of trafficking drugs.

4.     I have participated in four federal wiretap investigations throughout my career. During those wiretap investigations, I acted as a wire room supervisor, and as surveillance and operations Team Leader. During all of the above-referenced wiretap investigations, I drafted affidavits for search warrants, organized surveillance operations, interviewed suspects, and executed search warrants. I have conducted minimization, monitoring, and

summarization procedures required as part of a wiretap investigation. I also authored numerous tracking warrants to obtain precision location information for cellular telephones. As a result, I have gained knowledge of the methods utilized by drug traffickers and other criminals to avoid detection by law enforcement.

5. In the course of conducting drug investigations, I have personally interviewed confidential sources and persons involved in the distribution of illegal drugs. I have consulted with other experienced investigators concerning the practices of drug traffickers and the best methods of investigating them. In preparing this continuation, I conferred with other Special Agents and law enforcement officers.

6. The facts set forth in this Affidavit are based upon my personal knowledge, knowledge obtained from other law enforcement personnel, review of documents related to this investigation, communications with other individuals who have personal knowledge of the events and circumstances described herein, and information gained through training and experience. Since this Affidavit is being submitted for the limited purpose of seeking a complaint and arrest warrants against the individuals named below, I have not included every fact known to me concerning this investigation. Rather I have set forth only the facts I believe are essential to establish the foundation necessary to support the complaint and arrest warrants.

## PURPOSE OF AFFIDAVIT

7.    I make this affidavit in support of a criminal complaint and arrest warrants for **NAIGANG LIN**, **a/k/a "NAI LIN" (LIN)**; **BRANDON LIN (BRANDON), NAIQING LIN a/k/a "NAI QING LIN" (NAIQING), JUAN LYU (LYU),** and **DAVID ARMAN SMITH (SMITH)** for their participation in a money laundering conspiracy from in or about January 1, 2019 and continuing thereafter until on or about May 1, 2023, in violation of 18 U.S.C. § 1956(h)—that is a conspiracy to commit offenses in violation of 18 U.S.C. § 1956 and § 1957, to wit: to knowingly conduct financial transactions affecting interstate and foreign commerce, knowing that the proceeds involved in such transactions represented the proceeds of a specified unlawful activity— namely, the possession with intent to distribute and the distribution of marijuana—and to conduct such transactions (1) with the intent to promote the promote the carrying on of said specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); (2) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of said specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (3) to avoid a transaction reporting requirement under State or Federal law, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii), (4) to knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value

greater than $10,000, with such property having been derived from said specified unlawful activity, in violation of 18 U.S.C. § 1957; and (5) to transport, transmit, or transfer a monetary instrument or funds derived from said specified unlawful activity from a place in the United States to a place outside the United States knowing that such transportation, transmission, or transfer was designed in whole or in part in order to avoid a transaction reporting requirement under State or Federal law, in violation of 18 U.S.C. § 1956(a)(2)(B)(ii).

## BACKGROUND TO INVESTIGATION

8.   HSI, DEA, and IRS are presently investigating a drug trafficking organization (DTO) led by **NAIGANG LIN**, **a/k/a "NAI LIN" (LIN)**, and his associates for crimes relating to money laundering and black-market marijuana distribution.[1]   As explained in more detail below, **LIN**—a longtime Michigan resident—appears to have relocated to the Western District of Oklahoma, where he serves as a marijuana broker and distributor, taking advantage of the state's increase in marijuana grows—many of which investigators have determined are out of compliance with state law and are selling marijuana on the black-market in violation of both state and federal

---

[1]   A separate complaint is being filed concurrently with the present complaint relating to the drug trafficking aspects of the operation. **LIN** is charged in both complaints.

law.  I believe that **LIN** is being sourced by these marijuana grows and is also providing money-laundering services to them as well as laundering his own drug proceeds from his various illegal operations.

9.     The ensuing investigation has led agents to identify multiple co-conspirators in the **LIN** black-market-marijuana organization (hereinafter, the "LIN DTO"), including LIN's family members:   LIN's three brothers Naiyang LIN ("NAIYANG"), Naiqing LIN ("**NAIQING**"), Brandon LIN ("**BRANDON**"), his mother Li YANG ("YANG"), and his father Dong LIN ("DONG").[2]

10.   As part of this investigation, HSI agents have done extensive

---

[2]      To be clear, I believe that **LIN** has been operating his DTO since at least 2017.  **LIN** was investigated in 2017 and 2018 by the FBI for wire fraud, illegal gambling, prostitution, and drug trafficking. As part of that investigation, law enforcement obtained and downloaded his cellphone. Examination of that data showed that **LIN** was engaged in marijuana trafficking as far back as 2017.   For example, **LIN's** phone contained conversations with Larry Tillman and Darius Tillman, whom law enforcement later identified as marijuana customers based on messages in **LIN's** phone discussing balances due for marijuana sales between them and **LIN**.   For example, on October 21, 2017, **LIN** asked "D" (Darius Tillman) if he had 14 Glu.   "D", not understanding, then asked if **LIN** got 14 pounds.   D then stated he could get Pops ready with the 1600.   And on November 21, 2017, **LIN** sent Larry Tillman a video of multiple pounds of marijuana.   **LIN** then told Larry to get the money together and bring the $550 to his mom. Based on my training, experience, and knowledge of the investigation, I believe that these messages show **LIN** coordinating with Darius and Larry Tillman to distribute marijuana.   Further evidencing that **LIN** was in fact engaged in marijuana distribution as far back as 2019 was his wage information from the state of Michigan indicating that in 2019 he claimed only $8,676.90 in wages, all from Oriental Asian Buffet, a Chinese restaurant in Grand Rapids, Michigan.

financial analysis on accounts utilized by known members of the organization and have discovered that **LIN** has orchestrated the laundering of approximately $25 million in illicit proceeds, primarily from black-market marijuana trafficking. **LIN** and his associates are primarily using wire transfers, cashier's checks, funnel accounts, and the purchase of real estate, cars, and businesses in order to launder their criminally derived proceeds, which I know from my training and experience are all common ways of laundering criminally derived property.   To date, law enforcement has seized the following from **LIN** and his organization: more than 4,000 marijuana plants from illegal marijuana grows, more than 3,500 pounds of processed marijuana, and over $225,000 in U.S. currency.

11.    Central to the LIN DTO's operation appears to be Private Kitchen—a Chinese Restaurant located at 1117 NW 25th St., Oklahoma City, Oklahoma, in Oklahoma City's Asian District, which the **LIN** family owns. Regular surveillance at the restaurant, including both on-the-ground surveillance and surveillance via pole cameras, has established that either marijuana and/or drug proceeds are being aggregated there: law enforcement consistently observes individuals enter and exit Private Kitchen carrying backpacks, boxes, or luggage.   This is of course odd because individuals do not typically carry such items into restaurants, and any restaurant's particular customer base certainly does not do it regularly.   Further, as described below,

one cooperating defendant has told investigators that **LIN**, whom he/she identified as the owner of Private Kitchen, markets himself as being able to "move" money for marijuana distributors for a 6% fee so long as funds to be "moved" are more than $10,000. In short, **LIN** appears to not only be distributing marijuana from his own grows, but also laundering drug proceeds for other distributors. And as discussed below, **NAIQING** appears to be using Private Kitchen's bank account as a funnel account, "cleaning" funds for other distributors as well as paying LIN DTO couriers.

12. Some examples of the LIN DTO's black-market marijuana operation are detailed below to show that the monetary proceeds being laundered are from a specified unlawful activity. However, they in no way constitute the entirety of the information known by law enforcement regarding the LIN DTO's activities. Further bolstering law enforcement's belief that the financial transactions discussed herein involve proceeds of a specified unlawful activity, namely marijuana trafficking, is the fact that the defendants named in this complaint either have no reportable wages or have amounts of reportable wages not commensurate with their manner of life.

a) Information obtained from the state of Michigan indicated that **LIN** claimed only $7,500 in wages in the fourth quarter of 2020 and only $3,600 in wages in all of 2021. All wages were from Oriental Garden Buffet MI Inc., a Chinese restaurant in Michigan.

Information obtained from the state of Oklahoma indicates that **LIN** claimed $24,800 in wages from JJ Gourmet Kitchen 168[3] for 2022 but nothing in 2023.

b)      Information obtained from the state of Michigan indicated that **BRANDON** has not claimed any wages since 2017.

c)      Law enforcement is currently awaiting subpoena results for wage earnings for **NAIQING** through the state of New York, where **NAIQING** resides and has resided for the duration of the investigation.   Financial analysis of **NAIQING's** Bank of America account, however, does not show any payroll deposits into the account or any consistent deposits indicating employment in New York or any other state.

d)      Information obtained through the state of Oklahoma indicated that **LYU** has claimed no wages or source of income. This is consistent with what surveillance has shown, namely that **LYU** lacks any legitimate employment. **LYU** resides with **LIN** at 8117 NW 84th St., Oklahoma City ("the 84th St Residence), and is regularly observed with **LIN**.

e)      Information obtained from the state of Michigan indicated

---

[3]      As discussed *infra*, investigators have identified this as Private Kitchen's bank account with JPMorgan Chase.

that in 2020, **SMITH** claimed $8,876.09 in wages from Gun Lake Tribal Gaming and claimed no wages in 2021 or 2022.

### *Marijuana and/or Cash Seizures from the LIN DTO*

13.     As stated, law enforcement has made numerous marijuana and cash seizures from the DTO. The following incidents and descriptions have been condensed to introduce relevant players and establish that the LIN DTO is in fact an organization specializing in large-scale marijuana brokerage and distribution.

14.     On May 15, 2021, HSI was conducting surveillance at 5189 Bonasa Dr NE, Rockford, MI (the "Bonasa Residence").[4]   The purchaser of record for the Bonasa Residence is **LIN**. Agents surveilled **LIN**, Fei Xie (XIE)[5], and a

---

[4]     The Bonasa Residence, whose purchaser of record is **LIN**, was identified by law enforcement when bank documents were obtained from Lake Michigan Credit Union upon **NAIQING** opening an account on **LIN's** behalf and depositing $30,000 in cash.   **NAIQING** then tried to issue a cashier's check for the purchase of a commercial building located at 1400 Sunset Ave, Lansing, Michigan.   When asked for proof of residence, **NAIQING** provided a lease agreement with **LIN** (acting as a landlord) that indicated the residence for **NAIQING** was the Bonasa Residence.

[5]     XIE is an associate of **LIN's** who was stopped in January 2021 by TSA agents at Grand Rapids International Airport carrying $25,000 in cash, which he claimed were proceeds from a BMW vehicle that he just sold.   XIE produced what appeared to be a fake insurance card for the BMW.   I know from my training and experience that it is common for individuals involved in money laundering to have fake documentation in an attempt to conceal the presence and source of illicit funds, and this is precisely what I believe XIE was attempting to do.

female later identified as Amy Nguyen (NGUYEN) at the residence. XIE was observed placing large totes in the rear hatch of NGUYEN's vehicle. Upon LIN, XIE, and NGUYEN departing the residence in separate vehicles, Michigan State Police (MSP) conducted a traffic stop on NGUYEN's vehicle after it committed a traffic violation. NGUYEN consented to a search of the vehicle, and MSP discovered approximately 28 pounds of high-grade marijuana located in the totes. During the traffic stop, NGUYEN asked to retrieve multiple phone numbers from her phone, including the phone number for a contact name "Nai," (908) 935-8888, which law enforcement has since verified via surveillance and GPS pings belongs to **LIN**. As discussed below, the purchase of the Bonasa Residence appears to be part of the money laundering conspiracy described herein.

15. A few months later, on October 6, 2021, the MSP executed a search warrant at 9460 Homerich Ave SW, Byron Center, Michigan (the "Homerich Residence"), a residence in the name of **LIN's** brother NAIYANG. In the months prior to the search warrant, agents surveilled **LIN** and other members of the organization traveling to this residence, including YANG, DONG, and XIE. During the search, agents located an indoor marijuana grow and seized approximately 3,030 marijuana plants and approximately 42 pounds of processed marijuana. Further investigation confirmed that the electric utilities for the Homerich Residence are registered to "Jason Lee," with an

11

email address of nailin0219@yahoo.com—the same email address listed for **LIN** in financial documents obtained by investigators.

16.     Also during the search warrant at the Homerich Residence, law enforcement encountered four Mexican nationals who arrived at the residence in a Honda Odyssey van with MI license plate EFG3906.  Database checks indicate this vehicle is registered to **LIN**.   All four individuals were interviewed separately on scene and all four admitted to being hired by **LIN** and his mom "Lilly," known to law enforcement as YANG.   All four indicated they were farmers and there to grow and process the marijuana that they then delivered every two weeks to **LIN's** and "Lilly's" residence, which they identified as 1744 68th St SW, Byron Center, MI ("the 68th St. Residence"). All four individuals consented to a search of their phones and showed law enforcement the numbers they used to contact **LIN**.   In one phone, used by one of the individuals, he/she contacted **LIN** at (616) 606-2484, which law enforcement has since verified via several GPS pings and toll analysis does in fact belong to **LIN.**

17.     A few months later, on February 16, 2022, Michigan state police executed three search warrants on premises owned and/or frequented by **LIN** and NAIYANG, specifically: (1) 3040 Hamlet Circle, East Lansing, MI (the "Hamlet Residence"), (2) 2866 Turtlecreek Dr., East Lansing, MI (the "Turtlecreek Residence") (owned by **LIN**), and (3) the Sunset Residence (owned

by Feilos Holdings LLC, an LLC established by XIE). Each of those properties was found to contain marijuana, with the Hamlet Residence containing 85.25 pounds of marijuana, the Turtlecreek Residence containing 119.37 pounds of marijuana, and the Sunset Property containing 1,079 marijuana plants. While executing the search warrant at the Turtlecreek Residence, law enforcement encountered an individual who was one of the same Mexican farmers previously encountered at the search the Homerich Residence. This individual told law enforcement that after the search warrant at the Homerich Residence, he/she moved to Lansing, Michigan to work at **LIN**'s marijuana grows there. This individual also told law enforcement that **LIN** wants him/her to move to Oklahoma to work on his marijuana grows that are much bigger.

18. On April 21, 2022, one of the LIN DTO's couriers, Barry Stadler (STADLER), was traffic stopped in West Virginia driving a vehicle (registered to **LIN's** brother **NAIQING**) containing 430 pounds of marijuana. Toll analysis, as well as a subsequent search warrant on STADLER's phone, showed regular communication with **LIN**. More recently, on January 6 and January 7, 2023, STADLER was observed at one of the LIN DTO's stash houses located at 5800 Sanabel Court, Oklahoma City (the "Sanabel Residence"). Surveillance has regularly observed LIN DTO members moving large trash bags, which appear to be full, in and out of the Sanabel Residence. Throughout

13

this investigation, investigators have observed members of **LIN's** operation transporting what they believe to be marijuana inside large black trash bags. Investigators are certain that this is the DTO's modus operandi, as investigators have made several seizes from couriers for this organization of large black trash bags containing packaged marijuana.

19.    On December 19, 2022, Oklahoma Highway Patrol (OHP) conducted a traffic stop of Daniel Walsh (WALSH) in Oklahoma.    The subsequent search of WALSH's vehicle yielded approximately 262 one-pound bundles of marijuana.    Following the traffic stop, WALSH waived his Miranda rights and interviewed with OHP. During the interview, WALSH confirmed that he worked as a drug courier for a large-scale marijuana distributor based in Oklahoma City.    According to WALSH, he had transported bulk amounts of marijuana for the last six to seven months, making approximately two to four trips a month.    While most of the marijuana was from Oklahoma grows, WALSH did state that he sometimes would pick up marijuana from California, Georgia, and Michigan and bring it to Oklahoma for redistribution.    WALSH stated that for this trip, he had been driving to Florida.

20.    When asked to identify who precisely he was working for, WALSH could only state that they were Asian and that one of his employers had sent him a Zelle payment. (Zelle is the peer-to-peer mobile money transferring application that **LIN** and his associates regularly use.)    WALSH stated he

often met his employers at a Chinese restaurant in Oklahoma City's Asian District.

21.     It appears that **LIN** and WALSH met prior to WALSH departing with the truck full of week.   GPS location information for December 19, 2022, on **LIN**'s cellular device (616) 606-2484 and on WALSH's cellular device (989) 619-5756 indicated that beginning in the early morning hours of December 19, 2022, **LIN's** cellular device and **WALSH's** cellular device were in close proximity to one another in different places in Oklahoma, including the Private Kitchen, the city of Norman, and an area near Lake Overholser.   Their devices were also together near Lake Overholser, after which WALSH's device began to move southbound out of the city into rural areas while **LIN**'s device traveled to Norman, Oklahoma, for a brief time before returning to Oklahoma City. Based on my training, experience, and knowledge of the investigation, I believe that the GPS location information on **LIN's** device and WALSH's device show **LIN** and WALSH meeting to coordinate the pickup of the 262 pounds of marijuana that was seized from WALSH just hours later the night of December 19, 2022.

22.     On February 21, 2023, law enforcement was conducting surveillance at the Sanabel Residence when a blue-colored GMC Sierra bearing Oklahoma license plate LYK703 (the "blue GMC") arrived at the Sanabel Residence and backed into the driveway.   The driver exited the vehicle and

went into the residence. Agents had previously identified this vehicle as belonging to Terrance Allen (ALLEN), with a registered address of 8117 NW 84th St, Oklahoma City, Oklahoma—where surveillance has confirmed that **LIN** resides. ALLEN was previously identified as a suspected courier for **LIN** when, in May of 2022, ALLEN flew with **LIN** to Washington D.C. and then ALLEN separately flew to Tampa, Florida. While in Tampa, ALLEN was stopped while driving a U-Haul, during which law enforcement seized approximately 1,900 pounds of marijuana.

23.     Approximately 30 minutes after ALLEN's blue GMC arrived, the garage door of the Sanabel Residence opened and the blue GMC was backed into the garage. Agents observed the back doors of the vehicle being opened as well and an unknown individual putting something in the backseat. Approximately ten minutes later, the truck exited the garage and departed as **LIN** came out of the garage and watched the vehicle depart. Law enforcement trailed ALLEN's vehicle and eventually conducted a traffic stop after he committed a traffic violation. During the traffic stop, after law enforcement detected the smell of raw marijuana and ALLEN provided evasive responses, OHP conducted a probable cause search of the vehicle, which yielded approximately 262 pounds of marijuana that was contained in several large black trash bags in the bed of the vehicle and a large duffel bag in the backseat of the vehicle.

*Information from Cooperators*

24.     During the course of the investigation, law enforcement has conducted interviews with both cooperating sources and cooperating defendants. Each has further corroborated that **LIN** is a prolific black-market marijuana broker.

25.     One confidential human source (CS1) for instance, was previously stopped transporting marijuana on behalf of the LIN DTO. During a non-custodial interview several months after this traffic stop on CS1, CS1 told law enforcement that **LIN** and XIE are business partners; that **LIN** and XIE's organization collects money mainly through bulk cash and they have a group of people that transport marijuana for them; that **LIN**'s parents YANG and DONG help him with his operation; and that **LIN**—who CS1 referred to as "the big one"—bought an old adult care facility that he turned into a poker house.

26.     One cooperating defendant (CD1), who had been traffic stopped with several hundred pounds of marijuana, stated in a proffer interview that he had been transporting that marijuana on behalf of **LIN**; that NAIYANG was also involved in the LIN DTO; that **LIN's** mom YANG would pay CD1 courier fees; and that **LIN** was also shipping Ketamine to New York.   CS1 also identified one of LIN's properties, located at 5500 Division Ave. S., Grand Rapids, Michigan (the "5500 Division Location"), as a poker house/casino.

27.     Another cooperating defendant (CD2) was also previously arrested

17

in possession of 200 pounds of marijuana while driving from Oklahoma to Kansas. CD2 stated there is a "transportation" company that people will call to move marijuana in Oklahoma City.   CD2 was shown a picture of **LIN** and CD2 indicated he knew him but could not remember where.   CD2 was asked about Private Kitchen, and CD2 indicated that is the restaurant where all the marijuana growers go.   CD2 then asked to see a picture of **LIN** again and was shown a more recent photograph of **LIN**.   CD2 indicated that **LIN** was the owner of Private Kitchen and that **LIN** will tell people that, for $600, he will move money for them if it is over $10,000 and they want to avoid the banks.

### *Laundering Through Purchases of Real Estate*

28.   Investigators have established that one way **LIN** and his associates are laundering their proceeds is through the purchase of real estate, which I know from my training and experience is a common manner of laundering funds by drug dealers in that the conversion of the proceeds into real property has the effect of concealing the true origin of the funds and thereby "legitimizing" the illegally obtained drug proceeds.   **LIN's** associates also appear to be using their accounts to help him purchase real estate, some of which is then used in furtherance of the DTO.

29.   For instance, the Bonasa Residence—one of the LIN DTO's stash houses—appears to have been purchased by **LIN** with drug proceeds and with the use of other individuals' accounts.   Closing documents for the residence

show that **LIN** purchased it on or about January 6, 2021, and that a cashier's check in the amount of $72,486.67 was paid to Chicago Title for the balance of the purchase price at closing.   A copy of this cashier's check indicates that it was remitted by David A. Smith (**SMITH)** from an account at Bank of America. According to Bank of America, the cashier's check was purchased in cash and, because **SMITH's** name was on the check, he would have had to have been the purchaser.

30.   **SMITH** does not appear to have legal or other interest in and to the Bonasa Residence and therefore there is no apparent legitimate reason why **SMITH** would be the one funding this check.   Given the Bonasa Residence's role in **LIN's** drug trafficking organization, it is my belief that **LIN** either directly or indirectly (through other associates) gave **SMITH** the cash and had **SMITH** issue the cashier's check as to conceal the source and ownership of the illicit funds.   I also believe that the purchase of the Bonasa Residence was designed to facilitate the DTO's operation by acquiring a house that could be used to store and distribute marijuana—i.e., to promote the carrying on of drug trafficking, and I believe that **SMITH** was well aware the proceeds were from a specified unlawful activity and that he was helping to conceal the nature and origin of the funds used to purchase the Bonasa Residence.   I also believe that the obtaining of the cashier's check and the subsequent cashing of that check with Chicago Title is a clear example of

19

SMITH and LIN engaging in a monetary transaction of more than $10,000 with funds derived from marijuana trafficking.

31.    I believe that **SMITH** was well aware that he was helping to launder funds derived from marijuana trafficking due to his proximity to the LIN DTO.   Surveillance and toll analysis has established that **SMITH** is well familiar with several members of the LIN DTO. **SMITH** was identified on November 17, 2021, when he was seen arriving at **LIN's** 68th St. Residence in a gray Maserati registered to NAIYANG and then subsequently traffic-stopped in the vehicle as he departed the 5500 Division Property laer that day.   Then, on February 1, 2022, agents were conducting surveillance of Ahmed Harrold (HARROLD)[6], one of LIN's marijuana couriers, as HARROLD traveled to **SMITH's** residence at 3407 Fuller Ave SE, Grand Rapids, Michigan. Surveillance observed HARROLD and **SMITH** depart in HARROLD's Chevrolet Impala and travel to a Meijer grocery store.   Once they departed the store, **SMITH** and HARROLD traveled to the Hamlet Residence in Lansing, Michigan.   Law enforcement was able to obtain video surveillance from the store which showed HARROLD and **SMITH** purchasing food saver bags, which in my training and experience is commonly used to package marijuana.   Because law enforcement has previously seized marijuana from

---

[6]    Not long before, on January 19, 2022, law enforcement traffic stopped HARROLD with approximately 57 pounds of marijuana.

the LIN DTO in food saver bags, I thus believe that **SMITH** and HARROLD traveled to the Hamlet Residence to package LIN's marijuana.

32. Moreover, toll analysis of the multiple phones utilized by LIN over the course of the investigation indicates that LIN has been in contact with **SMITH**'s (616) 334-3968[7] cellular number approximately 791 times between April 21, 2021, to April 22, 2023. Toll analysis further indicates that **SMITH's** cellular number is in contact with other known associates of **LIN's**, including couriers like STADLER, Nathaniel Powell (POWELL) [8], and HARROLD, as well as NAIYANG, YANG. All of this leads me to believe that **SMITH**, while apparently involved in the LIN DTO's drug-distribution component, was undoubtedly aware that he was assisting **LIN** in laundering funds for the purchase of the Bonasa Residence.

33. I also believe that the purchase of a residence owned by **LIN**, at 5253 Division Ave. S., Grand Rapids, Michigan (the "5253 Property"), was also purchased with drug proceeds and for the purpose of serving as an illegal marijuana grow. (On March 8, 2022, law enforcement executed a state search warrant at the 5253 Property; although it appeared the LIN DTO had recently

---

[7] **SMITH's** phone number was identified through bank documents associated to an account at Honor Credit Union that **SMITH** is the signer on.

[8] POWELL was previously seen on surveillance in December of 2021 meeting with LIN in Michigan and was later identified as a marijuana courier for LIN by a cooperating defendant during a proffer interview.

removed a lot of the grow, approximately 40 pounds of marijuana remained and was seized from the property.)

34.     Closing documents obtained from the title company, Sun Title Agency, for the 5253 Property show that $10,000 of the earnest money deposit for the 5253 Property was paid with a cashier's check.   Financial analysis of **LIN's** girlfriend **LYU's** Chase Bank account ending in 3705 shows that she remitted the $10,000 cashier's check on April 30, 2021. The cashier's check appears to have been funded by two separate cash deposits into **LYU's** account: (1) a $9,000 deposit on April 12, 2021, and then (2) a $3,960 deposit on April 30, 2021.   Immediately after this April 30 deposit, **LYU** remitted the $10,000 cashier's check to Sun Title Agency.   Prior to these cash deposits, **LYU's** account would not have had a sufficient balance to fund the $10,000 cashier's check.   I believe that **LIN** and **LYU** structured these two cash deposits in order to stay below the $10,000 reporting requirement,[9] and I believe that these were drug proceeds provided by **LIN** and deposited into **LYU's** account to conceal the source and nature of the source of the funds and to avoid any

---

[9]     Under the Bank Secrecy Act (BSA), 31 U.S.C. § 5313 and its implementing regulations, banks and other "financial institutions" (as defined in the statute, 31 U.S.C. § 5312(a)(2), and the regulations, 31 C.F.R. § 1010.100(t)) are required to file a Currency Transaction Report for cash transactions in excess of $10,000. Cash transactions include deposits, withdrawals, exchanges of currency, and other payments or transfers by, through, or to the financial institution. 31 C.F.R. § 1010.311.

reporting requirements. Moreover, **LYU** has no legal title or other apparent interest in the 5253 Property, meaning there appears to be no legitimate explanation for her making this deposit to purchase this drug-involved premises. Additional examples of **LYU's** money laundering are discussed in more detail below.

35. The purchase of **LIN's** residence at 274 Stirling Dr., Starkville, Mississippi (the "Stirling Residence") is another example of **LIN's** associates using their accounts to help him purchase real estate, both in an attempt to conceal the origin of the drug proceeds and to further the LIN DTO's drug trafficking. On April 28, 2022, Bank of America account ending in 1697 was opened by **LYU** under the business name 274 Stirling LLC. According to the opening documents for the account, **LYU** is the only signer on the account and the business "274 Stirling LLC" was formed in Mississippi. A search of the Mississippi Secretary of State website indicates that the business was formed on April 18, 2022, 10 days prior to the opening of the account. The registered agent for the business is **LYU,** who indicates her address is 274 Stirling Dr, Starkville, Mississippi. Although the business **LYU** established is in Mississippi, the address used by **LYU** for this account is 8117 NW 84th St., Oklahoma City, Oklahoma—where surveillance has established **LIN** and **LYU** reside. In my training and experience, it is common for money launderers to establish LLCs that serve no real purpose and then open a corresponding bank

account to launder funds through in an attempt to legitimize these funds. Law enforcement has not identified any legitimate business that is being conducted by 274 Stirling, LLC. Nonetheless, the account had a flurry of activity between the time the account was opened, April 28, 2022, and when the Stirling Residence was purchased, on May 10, 2022. The purchase of the Stirling Residence appears to have been funded by a series of deposits from entities across the country which appear to have no relation to the LIN DTO. Much of the money also came from New York, which I know from speaking with other investigators who specialize in money laundering investigations into Chinese-American organized crime, is a common money laundering technique: funds from Chinese criminal organizations are laundered through "legitimate" businesses in an attempt to clean the money before being sent to their final destination. It bears noting that throughout the investigation **LIN** has been frequently documented travelling to New York. The deposits into **LYU's** Stirling Account in the days preceding the purchase of the Stirling Residence were as follows:

       a.     On May 2, 2022, there was a counter credit (deposit) in the amount of $180,000, which came from two checks: an $81,000 check from CIB Consulting, Inc. (located in Bayside, NY) and a $99,000 check from SCY Realty Team Corp. (located in Bayside, NY);

24

     b.    On May 4, 2022, there was a domestic wire from CIB Consulting, Inc. for $150,000;

     c.    On May 4, 2022, there was a counter credit (deposit) in the amount of $50,000 check from HBA Asian Service Inc which was deposited in Syosset, NY;

     d.    On May 5, 2022, there was a $14,226 ACH transfer from the account to New York Life Insurance;

     e.    On May 9, 2022, there was a $5,000 teller cash withdrawal in Oklahoma City.

     f.    On May 10, 2022, there was a counter credit (deposit) in the amount of $35,000 which was a cash deposit at a branch in Oklahoma City.

36.    Later that day, on May 10, 2022, there was a $375,962.26 wire to Brown, Langston, and Taylor in Tupelo, Mississippi, for the purchase of the Stirling Residence. Given the address of this property and the name of the LLC, it appears that 274 Stirling, LLC was formed for the purpose of purchasing this residence. It also appears that **LIN** and **LYU**, prior to remitting the money from the Stirling account for the purchase of the Stirling Residence, laundered the money by passing it through several New York based front companies.

37.    While the account has continued to operate, I do not believe that it

is being operated for any non-drug-related or non-money-laundering related purpose. For instance, On May 18, 2022, there was a $50,000 teller transfer to an individual named Kuang-Wei Huang in San Jose, CA. Financial tracing through Huang's account indicated that Huang utilized this money to purchase an approximately $1.5 million dollar home in San Jose, CA. And financial records also show that on June 28, 2022, WALSH (one of LIN's many marijuana couriers with no verified legitimate employment) transferred $20,000 from his Bank of America account ending in 4076 to the Stirling Account. In summary, based on my training, experience, and knowledge of the investigation, I believe that **LYU's** opening of the Stirling Account is yet another example of **LIN**, through the purchase of real estate, using his associates' accounts in order to conceal the nature and ownership of funds derived from his marijuana trafficking.

### *The LIN DTO Also Uses Funnel Accounts*

38. **LIN** himself appears to be well adept at making use of multiple bank accounts to move his money. I know from my training and experience that money launderers, particularly drug traffickers such as **LIN**, will often "funnel accounts" for the sole purpose of passing drug proceeds through the accounts in the belief that transfers from these funnel accounts will appear legitimate to both banks and financial investigators. For example, in the summer of 2021, law enforcement was notified by a branch manager at

26

Consumer's Credit Union that **LIN** attempted to open 14 accounts under the name LIG 3 LLC. The bank, however, declined to open the accounts based on the suspicious activity. According to the branch manager, **LIN** then called his lawyer, who then directed him to go to another bank and open the accounts. **LIN** went to Horizon Bank, where he already had an account, and opened 14 LIG 3 LLC accounts. According to the opening documents for each account, **LIN** listed each account as LIG 3 LLC and listed a different address for each account that is associated to **LIN** (i.e., the Homerich Residence, the Turtlecreek Residence, and the 5500 Division Property, etc.). Once the accounts were open, **LIN** deposited $1,000 in cash into the majority of the accounts and then, from each account, made several transfers in amounts around $900 or in smaller, broken up amounts to one of his LLC's accounts ending in 4483. Once the money was transferred from the other accounts to the account ending in 4483, **LIN** then withdrew $11,600 in cash of the $12,700 balance. I believe that such behavior is indicative of **LIN's** sophisticated laundering and his efforts to avoid having banks comply with their transaction reporting requirements under state and federal law. LIN also appears to be using an account belonging to his grandfather, Gui Ming Lin (GUI), to launder proceeds. For instance, on November 22, 2022, law enforcement trailed **LIN** and GUI to a Chase Bank branch located at 1825 44th St. SW, Wyoming, Michigan, where they were observed depositing large stacks of U.S. currency

from **LIN's** backpack into the ATM.   Later in the day, **LIN** and GUI returned to this same Chase Bank, visited the teller station, and left with what appeared to be various slips of paper, though agents could not clearly identify what those slips were.   **LIN** then visited First American Title Insurance Co., at 4362 Cascade Road SE, #109, Grand Rapids, Michigan.   Records provided by Chase Bank and First American Title established the purpose of the visits: **LIN** had deposited $50,880 into GUI's account in the following amounts:   $15,050, $6,750, $4,080, $4,000, $4,000, $9,000, and $8,000.   LIN later returned to Chase Bank to obtain a cashier's check for $52,306.79 drawn on GUI's account, and then used that check to pay off the balance on the Homerich Residence.

39.   In short, it appears that **LIN**—and his associates—are using GUI's bank account to launder their unlawful proceeds.   For example, bank account records for GUI show that LIN has wired money via Zelle, a peer-to-peer money transfer service, from GUI's JPMorgan Chase account ending in 5961.   Through subpoenas, agents obtained financial records of this account and identified that from January 1, 2021, to September 26, 2022, approximately $177,476 has been deposited into the account.   During the same date, approximately $177,401.69 has been withdrawn/debited to the account.   Most deposits into the account are from ATM cash deposits at various geographic locations such as Oklahoma City, Michigan, New York, and South Carolina—which are, not uncoincidentally I believe—places **LIN** and his

28

associates are known to have traveled, as well as Zelle transfers from various associates, both known and unknown. The majority of the debits to the account are from ATM withdrawals, online gambling companies, airlines, and Zelle payments to known and unknown individuals.

40. It appears that the LIN DTO is also establishing accounts under the guise of legitimate business purposes but then using those accounts in furtherance of the LIN DTO. For instance, agents have identified a now-closed JPMorgan Chase account ending in 8920 for which **BRANDON** was the sole signer. On June 2, 2020, **BRANDON** used this account to send a $2,000 Zelle payment to a Bank of America account ending in 4262 belonging to Pho LLC. Opening documents for the Pho LLC account indicate that the account was opened on May 9, 2019, by GUI (**BRANDON's** grandfather) and Li Jin YANG. Then, on June 4, 2020, **BRANDON** sent a $500 Zelle payment to the Pho LLC account. And two days later, on June 6, 2020, there was a $1,600 transfer to the Pho LLC account from GUI's account. While the Pho LLC account was ostensibly opened for a now-closed resultant associated with the **LIN** family, there are no transactions in the account relating to business conducted by a restaurant. The Pho LLC account, however, was used to purchase a Penske truck for $3,730.67, which I believe is significant because law enforcement have identified two other instances (ALLEN in May of 2022, and March 19, 2023) where the LIN DTO has used box trucks and/or moving

vans similar to Penske to transport marijuana. It appears that the truck was purchased, using the Pho LLC account, with money from the three payments described above. Based on my training, experience, and knowledge of the investigation, I believe that the account was opened for the purpose of disguising the nature and ownership of the funds passing through it.

41. The purchase of the Penske truck, however, was not the only instance I believe the Pho LLC account was used to launder funds. In fact, a handful of transactions occurred in April of 2020 that suggest funds were being laundered for the LIN DTO's associates. For instance, on April 21, 2020, there was a check deposit for $12,777.11 from the Toje Group. I know through financial analysis that the Toje Group is an LLC established by XIE and the check indicates it is for reimbursement. That same day, there was also an online transfer into the account from XIE for for $10,000, as well as a check deposit for $7,000 from the Toje Group. The check indicated it was for "Transfer Barry's $7,000 Payment." I thus believe that the LIN DTO was using the Pho LLC account to pay **LIN's** courier Barry STADLER. More suspicious activity followed. On April 22, 2020, there was a $8,700 cash deposit and then a $3,000 cash withdrawal. The next day, April 23, 2020, a $35,2000 wire was sent from the Pho LLC account to Kwor Chou (CHOU). According to the wire information, CHOU resides in Denver, Colorado. CHOU was previously identified through financial analysis of YANG's now

closed Oriental Asian Buffet PNC bank account when on April 22, 2020, YANG sent a $8,000 wire to CHOU as well.   In July of 2022, financial analysis of XIE's KeyBank account ending in 5358 indicated that XIE issued a $10,000 check to CHOU indicating it was for the Project La Salle Renovation. Documents discovered in a forensic examination of XIE's laptop indicate financial breakdowns of a large marijuana grow located at 24600 County Rd 40, La Salle, Colorado. In summary, I believe that the LIN DTO established the Pho LLC account for the intention of washing their marijuana proceeds, as the account—despite being ostensibly opened for a restaurant—does not have activity consistent with that of a restaurant.

42.   Based on my training, experience, and knowledge of the investigation, I believe that the LIN DTO opened the Pho LLC account not for business purposes but to launder illicit funds from LIN and XIE—funds that were then used to promote the carrying on of a specified unlawful activity (marijuana distribution), namely paying STADLER his courier fees and purchasing the marijuana grow in La Salle, Colorado.

43.   **NAIQING** also appears to be making use of funnel or fraudulent accounts.   An early example of such suspicious financial transactions occurred in March 2021 when Lake Michigan Credit Union ("LMCU") informed investigators that **LIN** held an account at LMCU, which was opened in 2019 and was closed in 2020 due to suspected fraud.   LMCU observed credits into

the account that would come from an unknown source followed by rapid withdrawals at ATMs. In email communication with LMCU, **LIN** told LMCU these were loans from friends that they were paying back. Based on my training and experience, however, large unexplained deposits followed in quick succession by rapid withdrawals from ATMs is consistent with **LIN** using the LMCU account to launder illicit drug proceeds.

44. Further documentation from LMCU indicated that **NAIQING** opened an account in February 2021 and immediately deposited over $30,000 in cash. This deposit was then used to create a cashier's check for the purchase of a business building. When asked for proof of residence, **NAIQING** provided a lease agreement with his brother **LIN** (acting as the landlord) that indicated the address of the leased premises was the Bonasa Residence and that **LIN's** address was the 68th St. Residence. LMCU determined that the cashier's check was intended to purchase 1400 Sunset, Lansing, Michigan (the "Sunset Property")—which investigators now know is owned by **LIN** and has since been found to contain an illegal marijuana growing operation. LMCU documents also indicated the email address used by **NAIQING** to open the account was the same one that **LIN** used when he established an account at LMCU. Because of these circumstances, the account for **NAIQING** was immediately closed due to suspected fraud. Based on my training, experience, and knowledge of the investigation, I believe that

32

LIN was using his brother **NAIQING** as a straw purchaser to launder cash through the purchase of a building because **LIN** was unable to obtain a second account at LMCU.

45.     **NAIQING's** primary use of a funnel account, however, appears to be through his use of Private Kitchen's bank account, a JPMorgan Chase account ending in 2713 under the name JJ Gourmet Kitchen 168 LLC (the "Private Kitchen account").   The sole signer on the account is **NAIQING**. Because opening documents for the account list the address as 1117 NW 25th St, Oklahoma City, Oklahoma, where Private Kitchen is located, I believe that JJ Gourmet Kitchen 168 LLC is doing business as Private Kitchen.   The opening documents also indicate that the business of JJ Gourmet Kitchen 168 LLC was established in Oklahoma on February 16, 2022.   In my training and experience, it is common for money launderers to establish LLCs then open a corresponding bank account to launder the funds and make it appear legitimate.   The opening of the account and incorporation of the business coincides with the approximate timeline of when **LIN** moved to Oklahoma City. A review of the transactions in this account corroborate my belief that Private Kitchen, while having some legitimate operations, is being used to launder proceeds of the LIN DTO.   From February 23, 2022, to February 1, 2023, approximately   $516,064.00   entered   the   account   and   approximately $577,325.11 exited the account.

46.     Based on review of bank records for the Private Kitchen account, **NAIQING** appears to be using the account to launder in a variety of ways.

47.     One way in which **NAIQING** is using the account is to pay marijuana couriers—couriers that would have no reason to be receiving payment from a Chinese restaurant in Oklahoma City. For example, on April 26, 2022, a $5,000 cash deposit was made into the Private Kitchen account. The same day, two checks ($2,500 each) were issued to POWELL—whom CD1 identified as a marijuana courier for **LIN** and who was previously identified on December 20, 2021, meeting with **LIN** in Michigan.   Then, on May 17, 2022, a $1,000 check was issued to POWELL.   Again, POWELL does not work for and does not appear to have any legitimate business relationship with Private Kitchen.   Based on my training, experience, and knowledge of the investigation, I believe that **NAIQING** is using the Private Kitchen account to pay couriers—in furtherance of marijuana trafficking—and to disguise the nature and origin of the LIN DTO's marijuana proceeds.

48.     It also appears that the LIN DTO is depositing marijuana proceeds into the Private Kitchen account in a manner so as to avoid BSA reporting requirements.   For instance, on May 27, 2022, six ATM cash deposits in Oklahoma City occurred in the following amounts: $8,840, $3,250, $3,220, $3,140, $2,345, and $2,280.   In my training and experience, these deposits are done to avoid the federal reporting requirement through the banking system

as to avoid reporting the source of the deposits to the bank. Legitimate cash deposits would be and could be made in one deposit, rather than splitting up the money into six separate deposits on the same day.

49. Another example of this occurred on August 1, 2022, where five ATM deposits occurred on the same day in the amounts of $4,000, $3,700, $3,320, $2,960, and $2,000. There is no legitimate explanation for why these cash deposits would be structured in this manner, other than to avoid bank reporting requirements. All of these amounts are under the reporting requirement and during the time the account has been open, the majority of cash deposits are structured in this fashion.

50. It also appears the account is being used to wash funds before they are remitted to other LIN DTO associates, including those that maintain their own marijuana farms. On May 31, 2022, two checks were issued from the Private Kitchen account to Zhi Wei Chen (ZHI) in the amounts of $20,000 and $5,000. The checks were deposited in Oklahoma City in ZHI's Bank of America account ending in 1097. Then, on June 13, 2022, there was a check remitted from the Private Kitchen account to ZHI in the amount of $16,925. Financial analysis of ZHI's account indicated that ZHI would then Zelle money to individuals and make payments to Canadian Valley Electric Company in Oklahoma. A subpoena was issued to Canadian Valley Electric for residences associated to the payments ZHI made which indicated that ZHI was paying

utilities for various grows in Oklahoma. According to the statements from ZHI's account, ZHI resides at a residence in Hayward, California, and not in Oklahoma. ZHI has not been seen at Private Kitchen during surveillance and appears to have no association with **NAIQING**. And it bears noting that throughout the investigation, law enforcement has seen instances where individuals residing outside of Oklahoma, primarily California, are utilizing laundered funds to pay for marijuana grows in Oklahoma.

51.     Based on my training, experience, and knowledge of the investigation, I believe that **NAIQING** is using the Private Kitchen account to pay marijuana couriers, to disguise those payments, and to wash the funds of other LIN DTO associates. Although there appears to be some legitimate money moving into the account in the form of Merchant Bank payments, the amount of cash deposits into the account that appeared to be structured in nature, as well as the payments to various known and unknown individuals that include a known courier for **LIN** and an individual that is making payments for utilities at marijuana grows, leads me to believe that the Private Kitchen account is being utilized to launder illicit funds.

52.     Finally, **LIN** and his associates are using their accounts to pay marijuana couriers. I find it significant that **LIN** is soliciting his associates to make these payments, who are in turn using both their private and business accounts to do so. I know based on my training and experience that such

activity is consistent with both concealment money laundering and promotional money laundering. Below is a non-exhaustive list of such transactions.

   a.   On November 19, 2021, $2,000 was deposited into **LYU's** JPMorgan Chase account ending in 3705 via a Zelle payment from a Yuhu Wang. Two days later, **LYU** then sent two $1,000 Zelle payments to GUI's account. That these two $1,000 Zelle payments were funded by the November 19 $2,000 deposit is certain: all other transactions involving **LYU**'s account during the intervening time were for less than $20.

   b.   On December 27, 2022, there was a $5,000 ATM cash deposit into the Sterling account that occurred in Oklahoma City and which was immediately followed by two Zelle payments to Deep Green Enterprises LLC, a company that belongs to STADLER according to the Michigan Department of Licensing and Regulatory Affairs (LARA).

   c.   **BRANDON** has sent at least $6,000 in Zelle payments from his Bank of America account ending in 0061 to HARROLD's Bank of America account ending in 2606). The payments were as follows: $1,100 on April 11, 2022; $1,330 on May 5, 2022; $300 on May 27, 2022; $1,000 on October 20, 2022; $1,000 on October 24,

2022; $100 on October 31, 2022; and $1,200 on January 4, 2023. On January 19, 2022, HARROLD was stopped in Michigan with 57.41 pounds of marijuana that had been picked up from various stash locations associated with the **LIN DTO**. Much like how **BRANDON** is paying STADLER on **LIN's** behalf, I believe that **BRANDON** is paying HARROLD in furtherance of marijuana trafficking and also to conceal the nature of the funds. Based on the investigation, I am aware of no other reason **BRANDON** would be sending electronic payments to HARROLD.

Further, financial analysis of **BRANDON**'s DraftKings account (user ID 10377333 in the name of Dragonbonus95) also indicates he is using the account as a funnel account to send money to his personal account ending in 3705 at Huntington Bank. Financial analysis of the Huntington Bank account shows the primary credits to the account are cash deposits, online sports betting platforms such as DraftKings and BetMGM, and Zelle payments from known and unknown individuals. The primary debits to the account are cash withdrawals, online sports betting platforms such as DraftKings and BetMGM, Venmo payments, and personal use spending such as rent and food. There are a significant number of transactions between the Huntington Bank account and the DraftKings account, which I find significant because I know from my training and experience with money laundering investigations that

online sports gambling platforms have become a new conduit to launder illicit funds. It appears that **BRANDON** is doing precisely this, as many of the credits to his Huntington Bank account are deposits from an online sports gambling outlet, and these deposits will in turn be deposited back into that specific online sports gambling outlet or a different one. For instance, on December 9, 2022, **BRANDON's** Huntington bank account received a $1,000 deposit from DraftKings and then a $115 deposit from DraftKings. On the same day, **BRANDON** sent $785 back to DraftKings. Three days later on December 12, 2022, there were two $500 deposits back into the Huntington account from DraftKings. It is suspicious that **BRANDON** would deposit money from his DraftKings account but then immediately send the majority of it back into DraftKings. Because most of the credits to the account are cash deposits that cannot be traced and peer-to-peer payments from co-conspirators, as well as the fact that **BRANDON** has no known source of legitimate income, I believe that **BRANDON** is using the DraftKings account to launder his personal funds.

### *Money Laundering to Avoid Reporting Requirements*

53.     Finally, I believe that **LIN** and his co-conspirators are engaged in financial transactions knowing that the transactions are designed in whole or in part to avoid reporting requirements under federal law. For example, as explained above, the 5253 Property was purchased in part with a cashier's

check from **LYU**.   Another cashier's check that went towards the purchase of the property, however, was a cashier's check for $10,000 dated May 24, 2021, from a Huntington Bank account ending in 5463 that belongs to **LIN**.   The check appears to have been funded from two separate cash deposits of $9,150, on May 12, 2021, and $2,550, on May 14, 2021.   This account was primarily funded by cash deposits which were in turn used at casinos and to pay an individual named Shawn Watson for a land contract.     And yet another check used to purchase the 5253 Property was a cashier's check from Consumers Credit Union for $100,000 which was remitted by **LIN**.   The check was issued from **LIN's** Consumers Credit Union account ending in 5212 and was funded by multiple structured cash deposits, and check deposits from a nail studio and various known associates.   An example of the structured cash deposits was on May 4, 2021, when three separate cash deposits occurred in the amounts of $1,000, $2,000, and $1,960.   Then on May 7, 2021, $6,532 was deposited in cash into the account.   Also, on May 26, 2021, two separate cash deposits were made into the account in the amounts of $1,760 and $7,240. In sum, it appears that **LIN** is depositing money into a variety of his accounts in amounts $10,000 or less.   Based on the facts that these are primarily cash deposits and that the deposits are occurring within days of one another, it appears that **LIN** is structuring these deposits of his marijuana proceeds in a manner so as to prevent banks from filing currency transaction reports documenting the

deposits.

54.     As for **BRANDON's** Bank of America account ending in 0061, it too shows significant structuring activity.   For example, on November 14, 2022, there were seven ATM cash deposits in a row for the following amounts: $3,000, $2,700, $1,500, $1,300, $2,150, $1,880, and $90.   Based on my training, experience, and knowledge of the investigation, I believe these payments were also structured to avoid the $10,000 reporting requirement and I believe were structured to avoid having to indicate the source of the income, which I know banks will require the depositor to list in such instances.

55.     Finally, I also believe that **BRANDON** is engaged in international money laundering. Financial analysis of **BRANDON's** bank of America account ending in 0061 indicates multiple Western Union payments to China that were sent in amounts less than $3,000 and in close proximity to one another.   I find this significant because Western Union's policy is to collect information on payments sent overseas of at least $3,000.   **BRANDON** has sent the following payments: $2,000 on December 23, 2020; $2,000 on December 31, 2020; $1,990 on January 6, 2021; $1,990 on January 14, 2021; $1,990 on January 28, 2021; $1,990 on February 11, 2021; $1,000 on February 18, 2021; $1,990 on February 23, 2021; $1,000 on March 17, 2021; $1,000 on April 14, 2021; $1,990 on May 4, 2021; $1,990 on June 30, 2021; $1,495 on December 16, 2021; $1,495 on December 17, 2021; $100 on March 10, 2022;

$1,000 on March 10, 2022; $100 on March 12, 2022; $350 on June 17, 2022; and $300 on September 1, 2022. All but two of these transactions were sent to Minyue Oyuang (OUYANG)—whom the FBI identified as NAIYANG's girlfriend during a previous investigation into **LIN**. (The other two payments were sent to GUI.) Given the close proximity and amounts of many of these payments, I believe that **BRANDON** sent these payments, constituting drug proceeds, on behalf of NAIYANG, knowing that such transactions were designed in whole or in part to avoid financial institution reporting requirements and to conceal the nature, origin, and ownership of the funds.

## CONCLUSION

56.    Based on my training and experience, and the foregoing information, I submit that there is probable cause to believe that **NAIGANG LIN, a/k/a "NAI LIN" (LIN)**; **BRANDON LIN (BRANDON), NAIQING LIN a/k/a "NAI QING LIN" (NAIQING), JUAN LYU (LYU),** and **DAVID ARMAN SMITH (SMITH)** have committed offenses in violation of 18 U.S.C. § 1956(h) and I would request that arrest warrants be issued.

_____
JOSH REINSCH
Special Agent
Homeland Security Investigations

Sworn to before me this ___2nd___ day of May, 2023.

_____
SHON T. ERWIN
United States Magistrate Judge
Western District of Oklahoma